oral argument not to exceed 15 minutes per side. Ms. Lo Cicero for the appellant. Good afternoon. I'm Hillary Holt Lo Cicero here on behalf of Dr. Richard Paulus. I would like to reserve three minutes for rebuttal. You may. Thank you, Judge Batchelder, Judge McKeague, and Judge Griffin, and may it please the court. As you can see, I have not been here. As you know, this is the second time that United States v. Paulus has been heard by this panel. The first time, of course, we were here on the United States appeal of the judgment of acquittal, and now we're here as Dr. Richard Paulus seeks review. I'd like to focus my time today on Dr. Paulus's claims under the Fifth and Sixth Amendment, although we certainly believe all of the arguments pressed in our briefs weren't the relief we've sought. And incredibly, all of the key facts that underlie the Fifth and Sixth Amendment claims were totally unknown to Dr. Paulus, to his counsel, and as a result to this panel during the first appeal. This court should hold that when Judge Bunning in the court below held an ex parte evidentiary hearing in which he completely excluded Dr. Paulus and his counsel, when he decided on the United States obligations under Brady v. Maryland, and he issued a ruling on the admissibility of evidence at Dr. Paulus's trial, that that was a Sixth Amendment violation of Dr. Paulus's right to counsel, pursuant to the authority of this court in United States v. Minsky. It is true, is it not, counsel, that Dr. Paulus's attorney at the time knew there was going to be a hearing, but he assumed it was on a privilege issue? That's not correct, Your Honor. I thought the record reflected that Paulus's attorney was aware from looking at the docket sheet that something was coming up. That's a very important issue here, Judge McKeague. Yes, there was an ex parte motion filed by the United States, and Dr. Paulus's counsel, not his trial counsel, but some of his other lawyers, were informed by the United States that the ex parte motion related to a privilege question that had been raised by King's Daughters Medical Center. I didn't get to that point. I didn't get to ask you whether he learned from the government's lawyers. So put that aside for just a second. Yes. I'm just curious, is it true or isn't it true that he knew from the docket sheet there was going to be a hearing, but that it was dealing with privilege? That is not correct. The docket sheet simply reflected an ex parte motion. There was never a docket entry that identified that a hearing would occur. Was the ex parte motion sealed or could he read that? Correct. It was under seal. He was not able to read the motion. So at least, I'm not saying this is significant or not, but at least he could have inquired as to what the ex parte motion dealt with. Yes, Your Honor. Or did he? He did. And the United States returned the counsel's phone call. And I'd like to point, if I may, to the record. But why did you say that the government called other attorneys for Paulus, not his trial lawyer? So the three trial counsel, one of whom was myself, we were not in Washington, D.C. at the time of this. We were not part of this phone call. So no notice was given to trial counsel, but it is correct that notice regarding the ex parte motion and only the motion was provided to one of Dr. Paulus's other lawyers. And did the information that was provided about the substance of the ex parte motion provided to one of the other lawyers? Did that lawyer communicate with Paulus's trial attorney? What was stated during the phone call by the assistant United States attorney who participated in that call? I'm not asking you what was in the conversation. Okay. You made a point of they didn't call Paulus's trial lawyer, so I'm just curious about that. Did the lawyers for Paulus they did call then relay whatever the information was to the trial counsel? So the record is I'm happy to answer based on what I know outside the record if you'd like. Up to you. And the answer simply is I don't remember. All right. This was three weeks before a trial. We were in the midst of deep preparations. Got it. Well, I'll ask the government. And during the phone call, there was a declaration submitted by the lawyer who participated in that phone call. And what was relayed to her by the AUSA was that it was a privileged claim by the hospital, but that it was not related to anything of substance impacting Dr. Paulus. And that's found at the record at 371-1, pages 13488 to 490. Following up on that, because I don't want to throw you off here, but I don't want to lose track of this too. There's a suggestion that you could have learned about this sample size, which seems to be the key of what was not provided to you by simply calling the hospital and asking. Now, that seems sort of odd to me because the hospital is one that was asserting that this was privileged, but the record doesn't disclose, the briefing doesn't say whether in fact there was any effort made to learn about this Shields letter from the hospital. So throughout the preparations for trial, and in fact, even before the indictment, the United States presented to Paulus's counsel on several occasions that the hospital had agreed to participate and help the United States in the prosecution of Dr. Paulus. And it was announced in a way that it was made clear to Paulus that the 75 procedures identified by the hospital were incriminating information. And I would focus... You're giving me an explanation for why you did or didn't do something, but you didn't tell me whether you did or didn't do it. Was there any attempt by Paulus, relevant or not, to contact the hospital to find out more about the 75 procedures and more about whatever sample that came from? There was an effort and the hospital declined to provide any information. Okay, so you did try and you were rebuffed. Yes, and again, I want to be clear that I don't... All I want to know. I just want to make sure I'm clear that I don't believe that's in the record. All right. But that's the answer, as I recall. So this was an opportunity for the United States when they had that phone call to say to Dr. Paulus's counsel, the ex parte motion also involves a Brady issue. That notice was not given. Dr. Paulus was not told Brady issues would be discussed. He also was never informed that the admissibility of evidence would be discussed. And admittedly, the United States itself didn't even know that because Judge Bunning, of sua sponte, announced he would rule on the admissibility of evidence. So we look at whether there was notice. There was notice that a filing had been made. There was no notice that a hearing would occur or did occur. There was no notice that it involved Brady. There was no notice that it involved the admissibility of evidence. The United States relies on United States versus Carmichael in support of its argument that Dr. Paulus waived his right to complain about the ex parte proceeding, as did the court below rely on that case. But the facts there are so distinguishable. In that case, during trial, lawyer for the government approached the bench to have an ex parte discussion. The judge said to the defense counsel, I'm going to speak to the prosecutor alone. And the lawyer said, Judge, that's your call. And on those facts, the Sixth Circuit ruled that the judge had made notice of it and the defense lawyer had acquiesced. And therefore, when they looked at the Sixth Amendment claim post-trial, they used the harmful error standard. Could you take this opportunity and just succinctly tell us why in your estimation this was such a big deal to Paulus, to know what the sample size was, what the doctor would have or might have done differently? And the reason that I'm asking that is if I recall right from the briefs, you really don't get to that point until almost the end of the reply brief. And you do talk about that in a couple paragraphs. But if you could just summarize all that so that at least I understand why this was harmful to him. Yes, Judge McKeague, I'd be happy to. The United States theory in this case was that Dr. Paulus was not being accused of medical malpractice. He was being accused of fraud. And the key difference between a med mal case and a fraud case here was evidence of a pattern, a systemic and repeated incidence of Paulus getting the number wrong on the cath reports. As this panel held in its first opinion, we wouldn't fault a doctor for simply misreading an angiogram. But when the government raises evidence of a systemic, repeated, as it argued in its closing arguments, daily, frequently, again and again and again, that raises an inference of fraud. It moves the case over the line, if you will, into the fraud realm. If Dr. Paulus had known that a very substantial study had been done of over 1,000 of his procedures, and the rate of disagreement wasn't 30% or 50% like the government continued to claim over and over in trial, but in fact those independent experts found it to be 7%, that would be a world of difference and allow Dr. Paulus to raise a defense of mistake and also to cross-examine all of the government's experts about why their rate of error came out so differently. I know that this follow-up question is probably just asking you to speculate, but I'm curious, obviously when Judge Bunting ruled on the motion to acquit, he was in possession of this information about the Shields letter and the sample size and the result, correct? He was, that's correct. Did he mention anything we might have missed or did he intimate at all that that played any role in his granting the first acquittal that we set aside? He did not. In fact, Judge Bunting, in his opinion, denying our motion for new trial based on this Brady violation, repeated his finding that he did not believe the 7% result was exculpatory. He believed it was inculpatory. Now, during the ex parte hearing, the United States urged Judge Bunting to find that it was exculpatory for precisely the reason that I tried to articulate a few moments ago, that the difference between a fraud case and a med mal case turned in this case on how frequently Dr. Paulus's numbers were wrong. In fact, as this court wrote in its first opinion, the government has raised evidence of a substantial repeated systemic errors and therefore that evidence is enough under the Rule 29 standard to raise an inference of falsity. Counsel? Yes, Judge. The question is whether the error is harmless. If we find a Sixth Amendment violation of the right to counsel, do we even have to go to harmless error or is prejudice presumed for a Sixth Amendment violation? Yes, Judge Griffin, that's a very important question. Prejudice is presumed for a Sixth Amendment violation. What's your best case? Because the government apparently does not concede that point and I thought that was very basic law, Sixth Amendment jurisprudence, but the government apparently does not concede it, so what is your best authority that a Sixth Amendment violation is prejudicial per se? Our best authority would be United States v. Minsky. That's 963 F2nd at 874. And also the case of Van v. Jones. That's 475 F3rd at 292. That reiterates the rule that was announced in Minsky, that denial of counsel at a critical stage is a per se error that requires automatic reversal. The government doesn't argue that this was not a critical stage, do they? They do not, and I think that's very telling. There was no attempt to address the reasoning of Minsky or the very detailed and elucidating discussion of this matter in the Van case. What is their defense of the Sixth Amendment? I'm not quite sure. What do you understand their defense? They've argued that under the line of precedent, starting with Roviero v. United States, that this was a Roviero-type hearing, in which if there is a compelling government interest, then there may be limited ex parte proceedings. But I would point out briefly, I think my time may be up, that this was not a Roviero proceeding. There was no compelling government interest. In fact, there was no government interest at all. It was a private interest that everyone agrees was invalid from the get-go. And secondly, even in Roviero, there is not a complete exclusion of defense counsel. There are replete examples through the case law of the creative ways that judges must step into the shoes of a defendant and allow them to participate so that their Sixth Amendment rights are protected. That did not happen here. Dr. Paulos was totally excluded. That requires automatic reversal because of that per se violation. Would you concede from the defendant's standpoint that had the hearing dealt only with the hospital's asserted privilege, that an ex parte hearing would have been proper if that's all that was discussed? On these facts, because Dr. Paulos did have notice of the privilege issue, I think our argument would be much weaker. Would I assume correctly, then, your position would be that the remedy, once the determination was made, either by the judge or by the government's argument or your argument, that we're going to get away from privilege at that point, should have stopped? Paulos should have been able to participate. Right. So the court in Minsky said that sometimes we do have to have in-camera rulings, in-camera reviews of documents. And that's, in fact, it may have even been required in the Minsky case, but that is not licensed to hold an ex parte hearing. How far in advance did this hearing take place before the trial was scheduled to start? Three weeks. So there would have been, arguably, time to reschedule or adjourn and get Paulos involved. Certainly. And it would have been easy. I apologize. One further question, and we will not be deducting from your rebuttal time. Thank you, Judge. When Judge Bunning then instructed the hospital and the government that they weren't to disclose any of this, did he give a reason for that? Do you know? He ruled that the evidence would be ultimately inadmissible at trial under Federal Rule of Evidence 408, and that because it wasn't admissible, he was instructing the United States not to disclose it to Paulos. Now, there was no valid legal basis for Judge Bunning to make that instruction, but instruct he did, and the United States complied. I think both of you agree that inadmissibility is not the standard for Brady. Correct. And we both agree that Federal Rule of Evidence 408 did not preclude admission of this evidence at trial. The United States agrees. It was admissible. It wasn't privileged. They were not able to give the information to Paulos based on Bunning's ruling. But once the 408 basis falls away, there is no justification for that ruling. Should the U.S. attorney disclose the information to our court? Did they have an obligation to be honest with us, even despite the district court order? I think the proper procedure would have been to seek interlocutory review or to go back to the Office of Professional Responsibility and seek further guidance about what steps the U.S. Attorney's Office should have taken based on Judge Bunning's order. All right. Thank you. I just want to ask one other thing. Following up on Judge Griffin's question, I think one thing he was alluding to is that when you were all here the first time, we didn't know about it either. Correct. So it's hard to figure out whether our ruling in connection with the government's appeal of the acquittal would have been different had we known the whole story. Yes, absolutely. So I assume your position is along the lines of the answer you just gave. In addition to the steps you think the government should have taken, do you have any authority that suggests that when it got here the first time that we should have known about this? We should have been told about this by the government? I'm not aware of any case law that addresses an obligation by the United States. I think when we look also at the trial, the United States repeatedly hammered the jury and did brief to this court. This was a systemic and repeated pattern, all the while knowing that they had in their back pocket dramatic evidence to undercut that point. You don't think the U.S. attorney has an obligation to disclose to us the appellate court exculpatory evidence before we affirm a conviction? I absolutely don't. She's saying they did. Oh, no. All right, thank you. You would, though, kind of agree that it puts the U.S. attorney of the AUSA involved in a little bit of a tough spot to say, well, I just won here, and now I need to appeal this. Yes, it does put them in a very difficult position, and I would point out that in the hearing, the assistant United States attorney who addressed this with the judge went back to the point several times, and she said, Your Honor, respectfully, I need to move you back to the Brady point because I don't think admissibility determines whether we must disclose it, and we must disclose it. Okay. Judge Griffin, any further questions? None, none. Thank you. Judge McKee? No, thank you. Okay. Thank you. Thank you. Good afternoon. May it please the court. Dave Weberman for the United States. Can I just start off with a question that Judge Griffin asks about the ethical obligations of the government? The trial attorney and the U.S. Attorney's Office throughout these proceedings in this case were consulting with the Office of Professional Responsibility and seeking guidance on what our position should be at the district court. So I just want to make the... What about in front of this court? Because coming here, you knew you had this problem, and did the Office of Professional Responsibility tell you you didn't need to tell us about it either? I don't know if that was broached with the Office of Professional Responsibility. Because at that point, all Judge Bunning had said is don't disclose it until after the trial's over. The trial was over. The trial was... So what would be possibly the reason to come here and argue that you have this overwhelming evidence of a pattern when you've deliberately... That's a misstatement. I didn't mean that. When you, following Judge Bunning's order, have failed to disclose something that suggests maybe it's not a pattern. We read the order as directing us to come back to Judge Bunning prior to sentencing. And we never got there because Judge Bunning issued a Rule 29 judgment of acquittal on findings in legal rulings that were not... It was a legal sufficiency, was not implicated... It did not directly implicate the letter. And that's the issue that was taken up to this court. But the letter certainly implicated your argument that there was legal sufficiency in order to convict and that he should not have set aside the verdict. Yes. As we said in our briefs, we think that the letter implicated this issue in the fact that it would have provided incriminating evidence. It would have helped the government. That's why we originally tried to get it into trial, but Judge Bunning ruled against us on that issue as well. In reality, this is both incriminating, as you attempted to use it, and exculpatory as the defendant claims that he would have used it. Is that a fair statement? It's a fair statement that the letter, as we said in front of Judge Bunning, supports a potential exculpatory theory based on lack of intent medical malpractice. But if I could go to that Brady materiality point, the only point at pretrial was that first prong, favorable to the defense. And consistent with DOJ policy, the AUSA thought that it needed to be disclosed. Judge Bunning, of course, ordered that it not be disclosed. The question for this court on Brady materiality is reasonable probability, had the letter been disclosed, the jury would have viewed things differently. And I don't think that inquiry cuts in favor of Dr. Paulus in this case. The letter was deeply incriminating. And if I could just reference a response to Ms. LoCicero's comment. The 7% number that she cites, that is 7% of Dr. Paulus's patients where the hospital has concluded that they received a medically unreasonable cardiac procedure, a stint. One out of every 14 patients on 7%, they had clinically normal angiograms, yet Dr. Paulus had marked on his records severe blockage, 70% or above. Consider that 7% next to the patient population in this case. Dr. Paulus is seeing, this was the testimony at trial, 10 to 15 patients a day on the average day, up to 25 on his busiest days. And that means that one out of every 14, that means maybe one, two, three every week if we take the hospital's letter at face value. That is why the government wanted, would have preferred that this letter be in trial. It shows, as this court said, a pattern of fraudulent over-diagnosing. This is not a letter that shows an excellent doctor who misread the occasional angiogram. Wouldn't it be fair to say that what we said is that a reasonable jury could conclude that that established a pattern? We didn't say as a matter of law that the statistics that you displayed dictated conviction in this case. That is correct, Your Honor. So if you're pounding the jury on 50% of your experts' tests, disagreed, and in many cases, significantly with Paulus, why wouldn't, knowing that another independent study of a much broader sample showed only 7%? Your Honor, can I just push back on a premise of the question? If you read the government's case, the government's closing, we never argued. Our experts, Dr. Rogosta, Dr. Molitorno, we never brought up, we never said he had a 50% error rate. That was not part of the government's proof at trial, because the district judge prevented us from saying where we got these procedures from. So we had to just rely on the single case studies that our expert presented. So it was not a 50% ratio versus a 7% ratio. That was not part of our case. How did your expert choose the cases that it used for its sample? So from, as I understand it, two pots. The experts looked at the files that the hospital had identified in the letter. The hospital had identified 75. And then the government had independently subpoenaed other files from the hospital to create a larger pile. So you started with the bunch from the hospital that the hospital thought had been over-diagnosed. Correct. Does that kind of skew things a little bit? The government never claimed at trial that we had a random sample. We did not get all of Dr. Paul's procedures over this five-year period. We got them, the 75 from the hospital and the rest from our experts through subpoenas of the hospital because we were engaged in litigation with the hospital at that time as well. Did the jury know what the sample size was that the one doctor that used the 75 test cases from the hospital survey consisted of, whether you emphasized it in the argument or not? Did the jury know that? Dr. Rogosis testified that he reviewed several hundred procedures. That's the only testimony. I think it was 200 and something. Yes, that sounds about right. He said, I reviewed 200 and I disagreed with Paulus on whatever it was, about 100 of those. He never made any comment on the other patient files that he didn't review. He only talked about the patient files that we presented. So there was no ratio inference in Dr. Rogosis' testimony that there was a 50% error rate or a 30% error rate. No, I got that. I'm just trying to find out whether he quantified it as a ratio or not. Did the jury know that he looked at 200 files and found 75 or whatever the number was were contrary to his medical diagnosis? Yes, they had those facts. So we don't know whether the jury drew any significance from basic math. They had the numerator. They had the denominator. We don't know whether they drew that inference or not. Correct. The jury's verdict is obviously a black box. But when we're dealing with a Brady materiality, the court has to make an independent assessment whether a reasonable likelihood exists that the undisclosed material would have affected the jury's verdict. And in our view, it wouldn't because even if you take the hospital letter at face value, it's still one out of every 14 patients. The hospital's telling us a reasonable cardiologist would not have found severe blockage. And that is over a five-year conspiracy, one out of every 14, that's a large patient population. And that's why at the end of the day, this claim fails under the materiality prong. But with all due respect, I think you're changing your argument here. Your argument in the briefs, unless I just misunderstood it, was that the hospital sample involved a short period of time, shorter period of time, like two years. Your indictment was a longer period of time. But then when you peel back that onion, you find that the vast majority of the cases that you presented were during the same time period as was the hospital's own study. Yes, Your Honor. I apologize. The hospital study ranged for about two years. All I'm saying is that that number that the hospital reported, 7%, is still incriminating. That's why under a Brady materiality analysis, the court should deny the claim. You must have some DOJ guidelines about when you bring these cases and when you don't. I assume, don't you? When we bring prosecutions? Yes, right. I would assume. Unfortunately, I'm a appellate lawyer, so I'm not involved in ordinary indictment decisions. We can agree that if you found one case out of the 4,600 procedures this doctor did, you wouldn't accuse him of fraud in federal court. Correct. So you accused him of fraud when one of your studies showed it was about 50%. Well, I mean, that sounds reasonable to me. So there's got to be some sort of a line between 1% and 50%. And you seem to say, ah, it doesn't matter if it's 7% or if it's 50%. And intuitively, this doesn't seem to make sense. Because the question here, even if it's 1 out of 14, over the course of the hospital study, that's still a significantly large patient population that's affected, that receive an unnecessary stint. Excuse me. Sorry. Did the jury get information about other places? And what would you expect in this bunch of, say, you know, 1,000 people, how many of them would have blockages severe enough to need stints? The testimony before the jury was that if it's 70% or above, they should get a stint. If it's 30% or below, nobody should get a stint. I didn't ask you about what the blockage had to be. I want to know, did the jury get some kind of information about what would you expect to see in a population this size, the large sample size, how many of them would be at a point where they would need to have stints? Because, I mean, one thing that has troubled me as I've been looking at this is people who don't think they have any problem whatever with their heart and run three or four miles every day aren't in the population that's going to see the cardiologist. Your Honor, the government did not have any witness testimony on what is the average percent of people who suffer from this degree of stenosis versus this degree of stenosis that wasn't in the case. Was there any testimony that was offered by anybody that said what would be a reasonable range of disagreements between cardiologists of comparable skill when they're reading these angiograms? On what the overall error rate was? How many cardiologists? That would be another way to put it. No, Your Honor. And I think the point, and this goes back to the intra-observer variability issue that the court, that the parties addressed in the first appeal, is the theory of the case was that no reasonable doctor is going to disagree over the range of blockages that the hospital's reporting, 70 or above versus 30 or below. And so the number should be zero or near zero. So you're saying that the reasonable area of disagreement is between 30 and 70, but not above or below, not 70 or below? That's correct. And that was the testimony at trial, including from one of the defense doctors who said doctors don't disagree about, and this is actually in the court's opinion, doctors don't disagree over that amount of range. So if somebody says 70% or above and another cardiologist says 30% or below, somebody is right and somebody is wrong. That was the testimony at trial. Interestingly enough, and correct me if I'm recalling this incorrectly, when the government's experts looked at the results of the hospital study, the government's experts disagreed with some of the hospital experts' conclusions that the doctor was wrong. Your own experts found the doctor was actually right in some of the cases where the hospital's experts found he was wrong. Is that right? No. As I understand it, we did not present testimony on all 75 patients that the hospital reported to us as medically unjustifiable. Isn't it a fair inference when we read that to conclude you didn't present it because your own expert couldn't corroborate that? I don't think that's a fair inference. We picked our cases by finding the most extreme examples, but we had to call our case somewhat. But I'm not aware of any time where our doctors said the hospital study is incorrect. Obviously, if I make a misstatement today, I'll correct it with the court. So you cherry-picked. Your Honor, we never claimed that this was a random sample, and the defense elicited that over and over again at trial. In my remaining minute, can I go back to Judge Griffin's question? He was asking what the government's threshold position is on the Sixth Amendment issue. It's twofold. First, under the Roviero line of cases, we think that this... We can draw an analogy here because we were dealing with a privilege. The fact that it wasn't a government privilege is irrelevant. This court has done the same for confidential juvenile records, which obviously are not done for the benefit of the government. Counsel, it started out as a hearing on privilege, but it morphed into a hearing on the admission of evidence. So, I mean, don't we have to see what the substance of the ruling was as opposed to how it started out? So I disagree in that if the court looks at how the privilege issue was briefed, the Rule 408, both sides were mentioning Rule 408 in their submissions to the court. So the Rule 408 issue was bound up in the privilege. And I guess this goes to Judge Batchelder's question. What was the district court's authority behind telling the government don't disclose that? And the district court says it at the end of the hearing. I want to resolve the privilege issue later. The court wanted to keep the hospital's privilege invocation pending, keep it at a stand. So the government walked out of the hearing with the understanding that this privilege issue was still alive. And that's why we think the worst... I don't understand that. I'm looking at the first or the second page of the transcript of the hearing. And right at the very beginning, the judge says, I have some questions for both of you, and I don't know if it's going to be necessary to address the privilege question. I think, more importantly, the admissibility of the underlying information you wish to disclose to Dr. Paulus, I've got to address that first. Now, once he then goes on and addresses that first, there is no need to, at that point, address privilege because he's found it's, one, inadmissible, which was wrong, and he's ordered you not to disclose it to the other side. So I don't understand how privilege helps you here. So we think it's all bound up. We think that the only reason that the judge could have ordered us not to disclose was his understanding that the privilege issues were still extant. But even if... But wait a minute. How can we be reviewing a ruling that he said not to disclose, which is, as you say, bound up in this, when he never explained why he ordered you not to disclose? We understood it as his decision to keep the hospital's privilege invocation pending. That's what we understood it. But pending, in the context of this, meant we'll deal with that after trial in connection with sentencing if he gets convicted. Is that a fair statement? Yes, Your Honor. So that doesn't mean to do with the trial. So my... Can I... No, I'm out of time. No, please. Yes. If the court believes that this, that Judge Bunning's discussion of these evidentiary matters went beyond the Roe v. Arrow box, then I agree we are... And this goes back to Judge Griffin's question. Everybody here is in Minsky. But I would urge the panel to read through Minsky. There's a... After in Minsky, the court can broadly discourage its ex parte communications. The panel in Minsky says, the burden of proving lack of prejudice is on the government. And then Minsky cites two other circuit decisions which conduct similar prejudice analyses. So if... So that decision or that point is critical because if Minsky is conducting an inquiry into prejudice, it's not a per se structural error that is... That requires reversal. And the second authority that I would urge the panel to look at is the Carmichael case, which the parties have both referenced in our briefing. There, Judge Gilman walks through Minsky and says what we think is the appropriate legal framework for this claim. And he asks, is there a justification for the ex parte hearing? And what type of prejudice did the defendant inure? And we think that that's how this court should resolve the threshold legal issues based on the analysis in Minsky and Carmichael which ring of prejudice inquiries. So I am... Well, your lack of prejudice argument, as I understand it, is twofold. One, you say experts are biased in favor of whoever hired them. And therefore, they wouldn't have believed the hospital's experts. Now, assuming that you're correct in that, which is a pretty strong statement for you to make, the same thing applies to your witnesses. You hired your own witnesses. If they're biased because the defense hired them, then they're biased because the government hired them. So I don't even understand how you get anywhere with that argument. And I'm sorry, I've momentarily forgotten what your second argument was. That's fine. Let me sweep away that issue about biased experts. This goes back to my colloquy earlier with the court. At base, given the trial record, Dr. Paulus's procedure load, the information in the letter, one out of every 14 patients is receiving a stint that no reasonable cardiologist would impose because Dr. Paulus says 70% or above and the hospital's independent review says clinically insignificant, 30 or below. One out of every 14, that is not an exculpatory fact. That is an incriminating fact and it supported the government's theory that this was a significant and sustained pattern of fraud. Unless the court has any additional questions. Yes, Mr. Lieberman, you argued this case before us the first time. Yes, Your Honor. So you are the attorney that did not disclose to us this exculpatory evidence that you knew of. What is your best argument that you did not violate your ethical obligation to this court by not disclosing this evidence to us? Judge Griffin, this is outside the record, I can respond that I knew that there was a privilege issue in the case. I did not inspect any of the documents or the ex parte hearing transcripts that were associated with the hearing so I did not know the substance of what had occurred during the ex parte conference. That is for me personally, that of course we as the government knew about it but your question asked about my personal knowledge. So you didn't know it wasn't a privilege hearing at all, it was an admissibility hearing and you didn't know there had been an admissibility ruling that Paulus wasn't participating in and you didn't know there was an order not to disclose. I simply knew that there was an outstanding privilege dispute and perhaps this is my fault, I did not inquire further as to the nature of that when I was preparing the government appeal in this case. That's fair enough. I thought it was limited to the Rule 29 order. Unless the panel has any additional questions that we'd ask that the panel affirm the district court. I have none. Judge McKee? I have none. No, thank you. Thank you. Thank you. I have just a few very brief points to address based on my very able colleague's arguments. First, there is evidence in the record that the United States did in fact tell the jury over and over again about the error rate, if you will. And you can see that very easily in the closing argument. That's Record 293 and it's pages 11768, 11740, 11738, telling the jury, this person you heard testimony from tells you at least half of these procedures were bad. You heard Dr. Elseberg tell you that 30% to 50% of the procedures Paulus did were bad. So it's not correct to state that the government didn't make representations to the jury about an error rate. Was there any evidence, I mean we have the 7% error rate from the hospital. Is there any evidence that that is kind of in the margin of error for misreading of these things? Yes. They have to prove fraud. They have to prove intent. And they're doing it with circumstantial evidence because of this high error rate. But is there evidence that everybody has some sort of an error rate and the 7% is within the range of normal error? Yes. Excuse me, I didn't mean to speak over you. No. Was there that this would be within the normal range of error? Yes. There was testimony from the Medicare expert that we called on behalf of the defense who explained that typically if a review was done of a physician and it was seen that he had somewhere near a 40% rate of error, that would be time to pull that physician aside and provide additional provider education to help him improve his rate of compliance. Would it be also safe to say that calling it an error rate might be a little bit of a misnomer? It's a disagreement in medical judgment rate as a practical matter. Yes, Judge McKeegan, that is such an important point. Now what the government seems to be arguing is the area where there might have been a legitimate disagreement between experts was the 30 to 70, but there isn't really a disagreement about above 70 or below 30. Do you agree or disagree with that? I agree. That's what the trial testimony showed, although we presented ample evidence that in reality it often is much more dramatic inter-observer variability. Now on the Rule 29 standard, when we were looking at it, were we assuming that the jury would credit everything presented by the government? Yes. If it was outside of inter-observer variability, the jury would have to believe the government's expert's statement that Paulus was wrong, but that would show medical malpractice. Within inter-observer variability, they're simply showing disagreement, and Paulus may very well be correct and their expert may be wrong, but it's a zone where they can disagree. Of these 75 procedures that we've been focusing in on in the Shields letter out of the 1,046 or whatever that number was, were they spread among below 30, 30 to 70, and above 70, or are they concentrated, say, in this 30 to 70, if you know? I believe the Shields letter said those were the ones where it was found to be below a threshold where they wouldn't call it inter-observer variability. So those 75, those physicians would say, it's not a reasonable disagreement, he was wrong. But even within that, and I'd like to point out that on this record there was also testimony that Dr. Paulus performed a stent for about a third of the patients for whom he did an angiogram. So the 1,049 stent patients really represented about 3,000 people who had an angiogram that he interpreted. 75 of those, that's 2.3% of the time, we would have been able to argue to the jury it was only 2.3% of the time when experts found he was wrong, and not that he was lying, not that he was committing fraud, but only that he was wrong. There was no pattern, and to the government's point about the way they selected the procedures, they absolutely cherry-picked. On the record, there are no less than five pieces of correspondence, that's at record 368-6 through-10, where we asked the government over and over again, please produce Brady, why haven't you produced Brady? Are you withholding Brady on the basis of a privilege or some other basis? If so, please tell us. And the government wrote back and said, we absolutely understand Brady, and we're offended that you would insinuate otherwise. Dr. Paulus was entitled to rely on those representations by the United States Attorney's Office that they complied with Brady. They did not. Dr. Paulus was denied his rights under the Fifth Amendment due process clause. He did not have a fair trial. And he was violated, his Sixth Amendment rights were violated, when so much of what was so critical to this case happened with him having no idea it had ever occurred. And we asked the... Counsel, this is kind of beyond the issues, but it's my understanding your client is incarcerated in prison right now, is that correct? He's been incarcerated for seven months. At his motion for bond pending appeal, did this exculpatory evidence come out? Was it argued to Judge Bunning that this is a reason not to incarcerate your client? We did. Judge Bunning rejected our motion. He... This was presented to him at the bond hearing?  The government responded, made similar arguments to what they argue today, and Judge Bunning denied the motion for bond pending appeal, as did the Sixth Circuit when we appealed that decision. Okay. When you appealed it to us, did you bring this information to us? Yes. Everything we've talked about today was outlined in that appeal that we made to the Sixth Circuit. Okay. Thank you. Unless there are further questions, we would ask that this court remand the case back to Judge Bunning with instructions to order a new trial. Judge Griffin, anything further? No. Nothing further. Thank you. Thank you, counsel. The case will be submitted.